UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kenneth Arlell Young,

       Petitioner,

                                Civil No. 23–cv–13254
                                Hon. _____

v.
                                Mich. Sup. Ct. No. 164077
                                Mich. COA No. 351793
                                3rd Cir. No. 19–000964–02–FC

Sherman Campbell, Warden,
Gus Harrison Correctional Facility,

       Respondent.

_____

## Petition for Writ of Habeas Corpus

Petitioner, Kenneth Arlell Young, represented by attorney, Ray Edward Richards, II, petitions this Honorable Court for a Writ of Habeas Corpus, pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d), and states the following:

1. Petitioner Young is a citizen of the United States and a resident of Lenawee County, Michigan, and is currently imprisoned in the Gus Harrison Correctional Facility, 2727 East Beecher St., Adrian, Michigan 49221.

1

2. Petitioner is currently unconstitutionally detained and imprisoned by Respondent, Warden Sherman Campbell, serving a term of 15 to 30 years imprisonment.

3. On December 3, 2018, Young was arraigned in the Third Circuit Court for Wayne County, Michigan, on the charges of open murder, MCL 750.316, possession of a firearm during the commission of a felony, MCL 750.227b, and tampering with evidence in a criminal case for which the maximum term of imprisonment for the violation is more than 10 years, MCL 750.483a(5)(a) and (6)(b).

4. Young was represented by attorney Patrick Nyenhuis (P76343), before charges were filed.

5. At trial, Young was represented by attorney William Otis Culpepper (P23520).

6. Young was found guilty after a jury trial on September 11, 2019.

7. Young was acquitted of first-degree premeditated murder, MCL 750.316(1)(a), and convicted of the lesser-included offense of second-degree murder. The also jury acquitted him of lying to a peace officer regarding a material fact during a criminal investigation, MCL 750.479c(1)(a) and (2)(d). He was additionally convicted of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and tampering with

evidence in a criminal case for which the maximum term of imprisonment for the violation is more than 10 years, MCL 750.483a(5)(a) and (6)(b).

8. Young was sentenced to 15 to 30 years imprisonment for the second-degree murder, 2 consecutive years for the felony firearm, and one to 10 years for the tampering with evidence charge. (Exhibit A – 9/26/19 Judgment of Sentence).

9. On appeal to the Michigan Court of Appeals, Young was represented by attorney Suzanna Kostovski (P39535). The Court of Appeals affirmed Young's conviction in a December 21, 2021 Opinion. (Exhibit B – 12/21/21 COA Opinion; *People v. Young*, Docket No. 351793, 2021 Mich. App. LEXIS 7199, p. 18 (Ct. App. Dec. 21, 2021).

10. On appeal, Young's attorney raised the following issues:

   a. The evidence was insufficient to support the conviction of second-degree murder.

   b. Defendant was denied the effective assistance of trial counsel.

   c. The trial court committed reversible error by admitting the video interview of the defendant.

   d. The trial court erred by instructing the jury on flight.

   e. The trial court erred by requiring trial counsel to use a peremptory challenge to dismiss a juror and not for cause.

11. Young filed an Application for Leave to Appeal with the Michigan Supreme Court on February 15, 2022. Attorney Ray Edward Richards, II, represented Young before the Michigan Supreme Court.

12. Attorney Richards raised two issues on Application for Leave to Appeal to the Michigan Supreme Court:

   a. The trial court abused its discretion by admitting parts of the police interview video showing privileged attorney-client communications between Defendant Young and his pretrial attorney and by admitting the parts showing multiple instances where the police attack Young's credibility throughout the interview in violation of Young's Right to Counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution.

   b. The trial court abuse its discretion by refusing to excuse a biased juror for cause in violation of Young's right to an impartial jury under Sixth and Fourteenth Amendments to the U.S. Constitution.

13. Young also filed a pro se "Standard 4" brief with the Michigan Supreme Court, raising seven issues.

14. On December 21, 2022, the Michigan Supreme Court denied the Application for leave to appeal. (Exhibit C – 12/21/22 Opinion).

15. Young has exhausted all state remedies available to him regarding the Sixth Amendment Right to Counsel issue.

16. Young has also exhausted all state remedies available to him regarding the Sixth and Fourteenth Amendment Rights to an impartial jury.

17. The issues raised in Petitioner's Application for Leave to Appeal to the Michigan Supreme Court are raised now in this petition.

18. As set forth in the accompanying Memorandum of Law, Petitioner is being detained in violation of the Sixth and Fourteenth Amendments of the United States Constitution.

19. Petitioner has not filed any previous Petition for Writ of Habeas Corpus in this or any other federal district court.

Respectfully submitted,

/s/ *Ray Edward Richards, II*
RAY EDWARD RICHARDS, II (P56972)
Richards & Associates, PLLC
Attorney for Petitioner Young
200 E Big Beaver Rd
Troy MI 48083-1208
(313) 694-8400
rayrichardsesq@gmail.com

Dated: December 21, 2023

5

**Brief in Support of**
**Petition for Writ of Habeas Corpus**

**Statement in Support of Oral Argument**

Petitioner requests Oral Argument. There are numerous and complex legal issues and facts that form the basis of this petition, as well as a complex chronology of state court proceedings. Oral argument would significantly aid this Court's decision.

## Statement of Issues

I.    The trial court abused its discretion by admitting parts of the police interview video showing privileged attorney-client communications between Defendant Young and his pretrial attorney and by admitting the parts showing multiple instances where the police attack Young's credibility throughout the interview in violation of Young's Right to Counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution.

II.    The trial court abuse its discretion by refusing to excuse a biased juror for cause in violation of Young's right to an impartial jury under Sixth and Fourteenth Amendments to the U.S. Constitution

## Statement of Facts

The procedural facts are provided in the above Petition and are relied on and incorporated in this Brief.

After a jury trial, Defendant Young was convicted of second-degree murder on an aiding and abetting theory, MCL 750.317, possession of a firearm during the commission of a felony, MCL 750.227b, and tampering

with evidence in a criminal case for which the maximum term of imprisonment for the violation is more than 10 years, MCL 750.483a(5)(a) and (6)(b).

The defense relies on the facts about the incident summarized by the Michigan Court of Appeals in its December 21, 2021 Opinion:

> On November 29, 2018, defendant left his apartment for a brief period, before returning home. When he arrived, he noticed his door was ajar and suspected someone might be inside. When defendant attempted to push his door open, he felt some resistance and heard someone tell him to get back. Defendant fled the unit of his apartment building and called [his father] Kenneth Gibson for assistance. While awaiting Kenneth Gibson's arrival, defendant patrolled the outside of his apartment unit with his gun. Defendant even fired one shot into the air, purportedly as a warning to the person he found in his apartment.

> Eventually, Kenneth Gibson was dropped off by someone driving a white car. Security camera footage from a nearby liquor store and restaurant showed Kenneth Gibson getting out of the car, crossing the street to speak with defendant, and defendant going to his car and opening the trunk. In a later interview with police, defendant stated he retrieved another gun from his trunk, gave one of the loaded guns to Kenneth Gibson, and kept one for himself. Defendant and Kenneth Gibson remained outside until defendant's cousins, Robert Gibson and Ebonique Gibson, arrived in a gray minivan, which is visible on the security camera footage.

> According to defendant, all four individuals then went inside defendant's unit of the apartment building, which contained four separate apartments. Defendant checked his apartment first, which no longer had anyone inside, and defendant did not notice anything missing. Defendant and his family members then went door-to-door trying to find the person who had been in defendant's apartment, kicking all three other apartment doors in the unit. One of the doors

8

broke open, but revealed no one inside. When they reached the apartment in which the victim was squatting, the victim answered his door in response to defendant's kick.

Defendant and his family members held the victim at gunpoint while defendant walked through the victim's apartment, looking for anyone else inside or anything that might have been taken from defendant's apartment. Defendant noticed his neighbor, Mr. Cass, arriving home at the time. Defendant went outside to speak with Cass, hoping to assure him everything was fine. While outside, defendant heard a gunshot inside the apartment, which was Kenneth Gibson fatally shooting the victim with the gun provided by defendant.

The victim fled, jumped out of the window in his apartment, and ran across the street to Spotlight Liquor Store. The victim later died from the gunshot wound. Defendant told police he heard from Kenneth Gibson that the victim had been shot. Defendant responded by removing his television and PlayStation video game console from his apartment, stowing his gun in his trunk, and driving away. Defendant, Kenneth Gibson, Robert, and Ebonique all met up at a separate location and decided they would create a false story and lie to the police.

[Ex. B – *People v Young*, unpublished per curiam opinion of the Court of Appeals, issued Dec. 21, 2021 (Docket No. 351793), pp. 2–3.]

\* \* \*

The contrived story involved defendant entering his apartment unit alone, while [his father] Kenneth Gibson waited outside, and having an altercation with the victim. They agreed to tell police defendant and the victim had a scuffle after defendant found the victim inside defendant's apartment, the scuffle led downstairs, and defendant shot the victim after defendant saw the victim reach for a gun. … Defendant told the same version of events to his pretrial counsel before going to the police station to make a statement.  [*Id.* at 26.]

9

A few hours after the incident, voluntarily came to the police station to make a statement about the incident. Detective Johnell White and Sergeant Derrick Griffin of the Detroit police interviewed Young in the presence of Patrick Nyenhuis, his pretrial attorney. (The People's Trial Exhibit # 176, DVD audio-video recording, 11/29/18, at 3:30).[1]  After Young initially told the false story, officers White and Griffin pointed out inconsistencies based on their review of surveillance videos and other evidence at the scene. *Id.* at 37:58, 38:55–41:25, 57:29, 58:47. White accused Young of lying and being a liar throughout the five-hour interview.[2] The Court of Appeals "reviewed the entire interrogation video and … found a significant number of comments about defendant's credibility made by Detective White." *Young*, unpub op at 28.

At that point, Young asked to consult his pretrial attorney alone, and the officers left the interview room. (People's Ex. 176, 1:00:45). The audio and video recording continued, and Young asked Nyenhuis if their

---

[1] This part of the "Statement of Facts" will cite to the time counter on the audio-video recording of the interview, which was People's Exhibit # 176. **The DVD was filed in the traditional manner with the Michigan Court of Appeals and Supreme Court**.

[2] *Id.* at 37:58, 38:55–40:25, 57:29, 58:47, 1:58:41–59:09, 59:48, 2:00:00–00:20, 2:00:29–38, 2:01:06–1:23, 2:02:45, 2:04:20–04:50, 2:06:42–9:31, 2:10:06, 2:10:56–11:46, 2:12:58–13:04, 2:13:35, 2:14:10–14:17, 2:15:02, 2:17:14, 2:18:27, 2:19:16–19:57, 2:20:45–21:44, 2:33:09–33:34, 2:33:40–33:47, 2:52:31–52:56, 2:53:48–54:28.

conversation was protected at least two times. *Id.* at 1:01:36, 1:02:55.

Nyenhuis assured Young that their conversation was confidential. *Id.* at

1:01:36. However, Nyenhuis' "behavior in the interrogation room showed an

obvious understanding he was being recorded." (Ex. B, *Young*, unpub op at

26).

Nyenhuis went on to berate and belittle Young for not telling him the

truth and instructed Young that he had to tell the police the truth, in part,

for Nyenhuis' personal interests: "Dude, what the fuck?" (People's Ex. 176,

1:03:31). "You put me in a tough situation right here." *Id.* at 1:04:24–44.

"You have to tell them the truth, right the fuck now." *Id.* at 1:05:20–38.

"You fed me a bunch of bullshit. You fed your cousin a bunch of bullshit."

*Id.* at 1:05:59. "Now you fucked it all up." *Id.* at 1:06:21. "Tell [Sgt. Griffin]

you're sorry." *Id.* at 1:44:34. And later, when Young again asked if "This is

between you and me?" Nyenhuis responded by saying "Don't fuckin' feed

me bullshit, okay? If someone's gonna feed me bullshit, I'd charge three time

as much money." *Id.* at 2:24:54–25:10.

Nyenhuis then advised and assisted Young in deleting evidence from

his phone by attempting to stand in front of the video camera and discussing

the deletion of texts and information from Young's phone: "No. I didn't say

you should delete them. I said you could delete those. I don't think you

11

should." *Id.* at 1:23:00. "I was trying to block that camera when you were fucking with your phone." *Id.* at 1:14:36.

Young finally asked Nyenhuis if he could get into trouble by telling the police the truth and admitting that he gave his father a pistol, and Nyenhuis told Young that "You didn't know he was going to shoot somebody. I don't think they're going to charge you with murder because of it." *Id.* at 1:39:36–56. Young asked what would have happened if he had shot through his apartment door when he first tried to open it, and Nyenhuis said Young would probably have been charged with manslaughter. *Id.* at 2:40:13–40:38. The jury also heard Young ask his attorney "If I didn't tell them I didn't find no gun or no shell, would I still be done [in trouble]?," *id.* at 3:34:04–34:16, and about the possibility of lying to police by creating another false story. *Id.* at 3:19:27–20:57.

When the officers returned to the interview room, Young made a statement telling the police the facts quoted above in this section of the Application. The police asked Young if he would be willing to make a written statement, but Young clearly did not want to make a written statement. *Id.* at 2:45:00–45:22, 2:48:07–48:19. Nyenhuis then pressured Young to agree to signing a written statement written by Sgt. Griffin because

Young had already given an oral statement. *Id.* Nyenhuis told Young he thought it was "best" if he gave a written statement. *Id.*

Young hesitated and asked about talking to his cousins first, but Nyenhuis said "No," arguing further for a written statement. *Id.* at 2:48:19–50:42. Nyenhuis even took the police officers' side about Young sweating and being nervous, sharing in a laugh at Young's expense. *Id.* at 2:53:48–54:45. After Young said "I really don't want to" make a written statement, Nyenhuis said "I think you should give a written statement." *Id.* at 3:02:05–07:00. "You have to do it man." *Id.* "Give a statement." *Id.*

Nynhuis brought up another one of his cases where witnesses got caught lying because they made exactly the same statements. *Id.* Nyenhuis' point was that it was obvious that Young made up the first story to the police because his statement matched his father's statement, word for word, which supported the same point that Det. White had just made. *Id.* And Nyenhuis continued to pressure Young to make a written statement when the two were alone again. *Id.* at 3:08:45. Nyenhuis said, "You want to get out of here faster? Let's give a written statement." *Id.* at 3:20:57–22:07.

Nyenhuis also left Young alone in the interview room with Sgt. Griffin, who talked to Young without Nyenhuis present. *Id.* at 2:55:30–58:55 and 2:55:30–3:01:37. Griffin expressed his opinion that Young must feel

guilty and be guilty of the offense because there was no other reason to make up the first story that he and his father told the police except to conceal their guilt. *Id.*

Later, during jury selection, Young's new trial counsel, W. Otis Culpepper, questioned potential juror number five (identified as "AZ"):

> [Defense Counsel]: As the defendant sits here now, has he, in your estimation, you know, do you believe he must have done something wrong or he wouldn't be here? We're telling the truth now.
>
> Juror Seat Five: I'm going to say yes because otherwise he wouldn't be here.
>
> [Defense Counsel]: So, sitting here, he must be a little guilty or he wouldn't be here, is that what
> you're saying?
>
> Juror Seat Five: I mean until he's proven his innocence or something. That's why they bring him here.   [Exhibit D – Trial Transcript 1, 8/27/19, at page 154; cited here as "T1, 154".]

*   *   *

> [Defense Counsel]: So him sitting here, now I'm telling you what to say, which kind of bothers me, but him sitting here is not proof of any wrong doing. Do you understand that?
>
> Juror Seat Five: He wouldn't be sitting here.
>
> [Defense Counsel]: I'm sorry?
>
> Juror Seat Five: If he was not doing it, not doing with the connection with this case, he wouldn't be here.   [T1, 155.]

*   *   *

14

[Defense Counsel]: But you say, you said to me that he him sitting there he must have done something wrong.

Juror Seat Five: Assuming.

[Defense Counsel]: Well, you understand you can't do that? You can't assume that he did something wrong just because he's sitting here.

Juror Seat Five: Yeah, you can't assume anything.   [T1, 156.]

* * *

[Defense Counsel]: I just, we do want people who can understand that. So, if, given that, do you, are you still sure you can be fair and impartial to Mr. Young?

Juror Seat Five: I'll be fair and impartial.

[Defense Counsel]: And I can depend on that?

Juror Seat Five: Yes, sir.

[Defense Counsel]: In spite of the fact that you think that he must have done something wrong or he wouldn't be here?

Juror Seat Five: Yes.

[Defense Counsel]: In spite of the fact that he must have be [sic] a little guilty, right?

Juror Seat Five: Right.

[Defense Counsel]: Nothing further.  [T1, 157.]


Defense counsel asked the trial court to remove Juror AZ for cause

"because he admits that the defendant must be a little guilty or he wouldn't

15

be here." (T1, 158). However, the trial court refused to excuse Juror AZ for cause. During the entire voir dire, defense counsel ended up using nine of the ten peremptory challenges available to Young, but he did not use a peremptory challenge to excuse Juror AZ. (T1, 107, 141, 158, 184) (Exhibit E – Trial Transcript 2, 8/28/19, at pages 42–43, 74–75, 96, 106; cited here as "T2, 42–43, 74–75, 96, 106").

## Argument

### Standard of Review

The issues presented in this Petition are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat 1214 (Apr. 24, 1996). The AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or,

16

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

[28 U.S.C. §2254(d).]

The "contrary to" and "unreasonable application" clauses have independent meanings. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is "contrary to" clearly established law if it applies a rule that contradicts the governing law set forth in Supreme Court cases or if it confronts a set of facts that are materially indistinguishable from the decision of the Supreme Court and nevertheless arrives at a different result from the existing precedent. *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). The "unreasonable application" prong of §2254(d)(1) permits a federal court in a habeas case to grant the writ if the state court identifies the correct governing legal principle from the Supreme Court, but unreasonably applies that principle to the facts of the Petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

In *Nevers v. Killinger*, 169 F.3rd 352, 360-361 (6th Cir. 1999), the Court held that the "contrary to" clause applies when the Supreme Court has set forth "a clear rule" requiring a certain result. If no such clear rule applies, the state court decision must be reviewed to determine whether it was an "unreasonable application" of Supreme Court precedent.

17

While it is true that AEDPA mandates a degree of deference to the state courts, such "deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Instead, federal courts have an "independent obligation to say what the law is." *Williams v. Taylor*, 120 S.Ct. 1495, 1517 (2000) (O'Connor, J., concurring). AEDPA "directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing the all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody … violates the Constitution, that independent judgment should prevail." *Id.* at 1511 (Maj. Op.).

Following the U.S. Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), a federal district court considering a habeas petition under § 2254 must engage in a two-step analysis. *Mosley v. Atchison*, 689 F.3d 838, 849-51 (7th Cir. 2012) (describing this analysis). First, it must examine whether the state court acted unreasonably under § 2254(d)(1) or (d)(2) on the basis of the record as developed in state court. If that standard is met, the federal court must then conduct an independent, *de novo* review of the constitutional issues to determine whether relief is warranted under §

18

2254(a). To aid its § 2254(a) analysis, the federal court may conduct an evidentiary hearing.

This Court relies on the facts determined by the state appellate court on direct review. *See, e.g., Girts v. Yanai,* 501 F.3d 743, 749 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1) (in a habeas proceeding "a determination of a factual issue made by a state court shall be presumed to be correct" unless the applicant rebuts the presumption "by clear and convincing evidence."); *Jaradat v. Williams*, 591 F.3d 863, 864-865 (6th Cir. 2010).

**I. The trial court abused its discretion by admitting parts of the police interview video showing privileged attorney-client communications between Defendant Young and his pretrial attorney and by admitting the parts showing multiple instances where the police attack Young's credibility throughout the interview in violation of Young's Right to Counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution.**

Petitioner argued on appeal to the state courts that certain portions of the video of his interrogation should have been omitted from the version played for the jury. The state court acted contrary to federal law or, alternatively, it unreasonably applied clearly established federal law when it disagreed in part, and assumed, without deciding, "that defendant is correct

in part, we nevertheless affirm because the challenged evidence was not outcome-determinative." (Ex. B – *People v. Young*, Opinion, p. 18).

The parts of the video at issue here involve the privileged communication between Young and Nyenhuis that was not a part of the few minutes of Young deleting evidence on his phone with Nyenhuis' advice and assistance and the later times when they were engaged in attorney-client communications. (People's Ex. 176, 1:00:44–1:44:00, 2:24:54–34:00, 2:40:13, 2:45:00–45:22, 2:48:07–48:19, 3:02:05–07:00, 3:08:45–3:24:08). The short portions of the video showing Young destroying evidence on his phone and Nyenhuis assisting him were admitted under the crime fraud exception to the attorney-client privilege. (Ex. B, *Young*, unpub op at 9–11).

As for the remainder of the approximately 40 minutes of video showing attorney-client communication, the Court of Appeals assumed that that part of the video was improperly admitted. *Young*, unpub op at 11. However, the Court focused its analysis and reason for affirming on the fact that the jury would have heard Young's final and accurate statement of the incident that he later made to the police, which was the same description of the incident that he told Nyenhuis when they were alone. *Id.* at 11–12. The Court held that Young failed to show that "it is more probable than not that the error was outcome determinative." *Id.* at 11 (citation omitted).

The Court failed to address the unfair prejudice that resulted by the erroneous admission of the video, which allowed the prosecution to use Young's privileged attorney-client communications against him at trial. There was no reason to introduce that portion of the video showing his privileged communication with pretrial counsel.

The purpose of the attorney-client privilege is to allow a client to confide in his or her attorney secure in the knowledge that the communication will not be disclosed. The U.S. Supreme Court has addressed the nature and scope of the privilege:

> Questions of privilege that arise in the course of the adjudication of federal rights are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. Rule Evid. 501. We have recognized the attorney-client privilege under federal law, as "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Although the underlying rationale for the privilege has changed over time, see 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961), courts long have viewed its central concern as one "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S., at 389. That purpose, of course, requires that clients be free to "make full disclosure to their attorneys" of past wrongdoings, *Fisher v. United States*, 425 U.S. 391, 403 (1976), in order that the client may obtain "the aid of persons having knowledge of the law and skilled in its practice," *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888).

> The attorney-client privilege is not without its costs. Cf. *Trammel v. United States*, 445 U.S. 40, 50 (1980). "[S]ince the privilege

21

has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Fisher*, 425 U.S., at 403.

[*United States v. Zolin*, 491 U.S. 554, 562, 109 S. Ct. 2619, 2625-26 (1989).]

The privilege even survives the death of the client. *Swidler & Berlin v. United States*, 524 U.S. 399, 410-11, 118 S. Ct. 2081, 2088 (1998). "The general rule is not disputed, that confidential communications between client and attorney, are not to be revealed at any time." *Chirac v. Reinicker*, 24 U.S. (11 Wheat.) 280, 294 (1826).

Multiple times during the approximately 40 minutes of privileged attorney-client communication, pretrial attorney Nyenhuis went on a tirade, berating and belittling Young in an unprofessional manner and treating him with disrespect rather than providing effective assistance of counsel. (People's Ex. 176, 1:03:31, 1:04:24–44, 1:05:20–38, 1:05:59, 1:06:21, 1:44:34). The effect was to diminish the jury's opinion of Young and deny him any chance for an independent assessment of his credibility. The jury saw Nyenhuis treat Young in the same manner that Detective White did. "[T]there seems to be no excuse for pretrial counsel's decision to have a frank discussion with defendant without taking any precautions—other than occasional whispering—to ensure confidentiality in a room he knew was

22

being audio-and video-recorded. It is beyond dispute that pretrial counsel's representation in that regard fell below an objective standard of reasonableness." (Ex. B, *Young*, unpub op at 26).

When that privileged and demeaning conversation was combined with the remainder of the video interview showing Nyenhuis assisting Young with the destruction of evidence (People's Ex. 176, at 1:23:00, 1:14:36), and Detective White's multiple attacks on Young's credibility by calling him a liar, *id.* at 37:58, 38:55–40:25, 57:29, 58:47, the erroneous admission produced an unfair prejudice that would overwhelm any jury. At a minimum, it was more probable than not that the error was outcome determinative.

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Davis v. Ayala*, 576 U.S. 257, 267, 135 S. Ct. 2187, 2197 (2015) (citation omitted).

Regarding harmless error analysis, the US Supreme Court has held that a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the ... standard set forth in *Brecht [v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ]." *Fry v. Pliler,* 551 U.S. 112, 121 (2007). Under *Brecht,* a federal habeas court considers whether the error "'had substantial and injurious

23

effect or influence in determining the jury's verdict.'" *Brecht,* 507 U.S. at 623, 113 S. Ct. 1710 (citation omitted). If, however, "the matter is so evenly balanced" that the habeas court has "grave doubt" as to the harmlessness of the error, it "should treat the error, not as if it were harmless, but as if it affected the verdict." *O'Neal v. McAninch,* 513 U.S. 432, 435 (1995).

The jury had to decide whether or not Young had the intent to kill, the intent to cause great bodily harm, or whether or not he was criminally liable for "those crimes that are the natural and probable consequences of the offense he intends to aid or abet." *People v Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006). Without the prejudicial parts of the video eliminating all of Young's credibility, the jury could have believed that he intended something less than murder or even home invasion by the fact that he had abandoned pursuit of the victim and was outside talking to a neighbor at the time of the shooting by his father. The evidence attacking Young's credibility unfairly prejudiced him by invading the province of the jury and overwhelming its decision on all issues involving his credibility.

**II.    The trial court abused its discretion by refusing to excuse a biased juror for cause in violation of Young's right to an impartial jury under Sixth and Fourteenth Amendments to the U.S. Constitution**.

The fair trial right secured by the Sixth Amendment guarantees that an accused is entitled to "trial[] by an impartial jury." U.S. Const. amend. VI. The Supreme Court has held the right to jury trial in criminal cases "fundamental to our system of justice." *Duncan v. Louisiana*, 391 U.S. 145, 153-54, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). The right to a jury trial presupposes "an absolute right to a fair and impartial jury." *Id.*

The United States Supreme Court has held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. *Smith v. Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 945 (1982).

A district court also "has an obligation to investigate a colorable claim of external influence on the jury to determine whether any external influence occurred and, if so, whether it was prejudicial." *United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017) (citing *Remmer v. United States*, 347 U.S. 227, 229-30, 74 S. Ct. 450, 98 L. Ed. 654, 1954-1 C.B. 146 (1954)).

In this case, the juror in seat five, AZ, clearly stated that he believed Young must have done something wrong or he would not be on trial:

25

[Defense Counsel]: So, sitting here, he must be a little guilty or he wouldn't be here, is that what you're saying?

Juror Seat Five: I mean until he's proven his innocence or something. That's why they bring him here.   [T1, 154.]

Even after defense counsel told juror AZ that Young "sitting here is not proof of any wrong doing," AZ still insisted that "[h]e wouldn't be sitting here," otherwise. (T1, 155). Juror AZ claimed he could be fair and impartial in spite of the fact that he still believed that Young must have done something or he would not be on trial. *Id.* at 157.

Defense counsel asked the trial court to remove Juror AZ for cause "because he admits that the defendant must be a little guilty or he wouldn't be here." *Id.* at 158.

Juror AZ was not impartial, he was biased. He believed Young had done something wrong before hearing any evidence, and his biased belief did not change. He only claimed he could be fair and impartial, but with the caveat that he still believed Young must have done something. The Court of Appeals' analysis that "[i]f Juror AZ truly and inescapably believed defendant was guilty simply for being on trial, he would not have answered in such a manner" (Ex. B, *Young*, unpub op at 43), is not supported by the record.

26

The Court of Appeals held that Young's argument failed under the test in *People v Legrone* (Ex. B, *Young*, unpub op at 16–17):

> [I]n order for a party to seek relief in this instance, there must be some clear and independent showing on the record that: (1) the court improperly denied a challenge for cause, (2) the aggrieved party exhausted all peremptory challenges, (3) the party demonstrated the desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable. [*People v Legrone*, 205 Mich App 77, 81; 517 NW2d 270 (1994) (citation omitted).]

Under federal law, a defendant is not obliged to use a peremptory challenge to cure a judge's error in failing to dismiss a potential juror for cause. *United States v. Martinez-Salazar*, 528 U.S. 304, 307, 120 S. Ct. 774, 777 (2000). "We have long recognized the role of the peremptory challenge in reinforcing a defendant's right to trial by an impartial jury." *Id.* at 311 (citation omitted).

Here, Juror AZ was biased and should have been excused for cause. The error occurred and was plain. It also affected Young's substantial right to have an impartial jury to decide his case. The error affected the outcome of the trial because Juror AZ refused to abandon his misunderstanding of the presumption of innocence and found Young guilty on that basis. It also likely tainted the rest of the voir dire panel and the finally selected jury. "Those on the venire must be 'indifferently chosen,' to secure the

defendant's right under the Fourteenth Amendment to 'protection of life and liberty . . . .'" *Batson v. Kentucky*, 476 U.S. 79, 86-87, 106 S. Ct. 1712, 1717-18 (1986) (citation omitted).

## Certificate of Appealability

"[T]he district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant." Rule 11(a), 28 USC § 2254.

According to the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473, 483-484, 120 S. Ct. 1595, 1603-1604 (2000),

> [t]he writ of habeas corpus plays a vital role in protecting constitutional rights. In setting forth the preconditions for issuance of a COA under § 2253(c), Congress expressed no intention to allow trial court procedural error to bar vindication of substantial constitutional rights on appeal.
>
> \* \* \*
>
> Under AEDPA, a COA may not issue unless "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c) (1994 ed., Supp. III). … To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that...includes showing that reasonable jurists could debate whether...the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.' "

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:

28

The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

[*Slack v. McDaniel*, 529 U.S. at 483-484, 120 S. Ct. at 1603-1604 (citations omitted).]

Petitioner relies upon the foregoing arguments in this petition and memorandum to show a violation of his Constitutional rights on the legal issues and particular facts and circumstances of this case, upon which, reasonable jurists would find in favor of the Petitioner, or they would otherwise find that the Petitioner's claims were debatable and "deserve encouragement to proceed further" on appeal. *Id.*

## § 2254(a) Argument and Request for Relief

Petitioner's claims meet the burden set out in § 2254(d), so this Court must conduct an independent review of these constitutional claims under § 2254(a).

Having shown that the trial court made unreasonable determinations of fact, acted contrary to clearly established federal law, and unreasonably applied clearly established federal law, Petitioner's claims survive the threshold review set out in § 2254(d)(1) and (d)(2). The merits of his claims

29

must therefore be reviewed under § 2254(a) *de novo*, without any deference to the state courts' decision-making, in order to determine whether a constitutional violation has occurred. See *Mosley v. Atchison*, 689 F.3d 838, 849-51 (7th Cir. 2012) (setting out this two-step analysis).

On the basis of Petitioner's arguments and the factual record developed in state court, Petitioner moves this Honorable Court to grant him a writ of habeas corpus so that he may be discharged from his unconstitutional confinement and restraint.

Alternatively, Petitioner moves that Respondent be required to appear and answer the allegations of this petition and requests that this Court conduct an evidentiary hearing on both claims.

If this Court denies the petition on any issues presented, then Petitioner moves this Honorable Court to grant a Certificate of Appealability, pursuant to Rule 11(a), 28 USC § 2254, on those issues.

Petitioner also moves this Honorable Court to grant other relief as the Court may deem just and proper under the circumstances; and finally, he moves for oral argument in this matter.

Respectfully submitted,

/s/ *Ray Edward Richards, II*
RAY EDWARD RICHARDS, II (P56972)
Richards & Associates, PLLC
Attorney for Petitioner Young
200 E Big Beaver Rd
Troy MI 48083-1208
(313) 694-8400
rayrichardsesq@gmail.com

Dated: December 21, 2023

## Certificate of Service

I certify that on December 21, 2023, the above Petition for Writ of Habeas Corpus, Index of Exhibits, and Exhibits were filed with the Clerk of the Court using the CM/ECF system, which served the document(s) to the parties of record.

/s/ *Ray Edward Richards, II*
RAY EDWARD RICHARDS, II (P56972)
Attorney for Petitioner Young

31